# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

NORMAN STAPLETON, PAUL ADAMS,
CRAIG BATES, DUANE BULL,
CAMERON CANADY, SCOTT COAKLEY,
KENNETH GRAY, DAVID FOLEY,
TIMOTHY GIBSON, JAMES HAMILTON,
STEPHEN KOZLOWSKI, THOMAS KURUC,
WILLIE MCGEE, ALLEN OWENS,
MICHAEL PASKEL, JAMES SMITH,
TYRONE SMITH, SEAN TATE,
and MICHAEL VAN CASTER,                                    ORDER

                              Plaintiffs,                 16-cv-406-jdp

        v.

KEVIN CARR, RANDALL R. HEPP,
EDWARD WALL, JON LITSCHER, GARY HAMBLIN,
CATHY JESS, MARC W. CLEMENTS, JOY TASSLER,
MICHAEL McCORMICK, PAT CHAMBERLAIN,
and JOHN MAGGIONCALDA,

                              Defendants.

---

This case is about the safety and quality of the drinking water at the Fox Lake Correctional Institution (Fox Lake). Plaintiffs are 19 current or former prisoners at Fox Lake. Several times over the past 12 years, the prison's water has not met federal and state standards limiting the amount of certain chemicals in drinking water, including lead, copper, iron, and manganese. Plaintiffs contend that this has made the water unsafe to drink and aesthetically unpleasing, and that prison staff and Department of Corrections officials have failed to fix the problems, causing at least some of them to suffer serious medical conditions. They bring claims under the Eighth Amendment to the United States Constitution, contending that defendants subjected them to cruel and unusual conditions of confinement and provided them with inadequate medical care.

Two sets of defendants have filed motions for summary judgment, Dkt. 99 and Dkt. 105, and plaintiffs followed with a motion for preliminary injunctive relief. Dkt. 130. The motions for summary judgment are really motions for partial summary judgment, because they focus on plaintiffs' conditions-of-confinement claims and do not address plaintiffs' medical care claims.

The undisputed facts here show that the Fox Lake water has met health-based clean-water regulations for the past few years, so I will grant summary judgment to defendants on claims about the current safety of the water and I will deny plaintiffs' motion for preliminary injunctive relief. I will grant summary judgment to defendants on plaintiffs' claims about the past instances in which the Fox Lake water violated health-based regulations because defendants worked to fix the problem and plaintiffs fail to show that defendants consciously disregarded the water safety.

Plaintiffs also bring claims about the poor look, taste, and smell of the prison's water, after it violated aesthetic, non-health-based standards in 2016. I will grant summary judgment to defendants on that claim because plaintiffs fail to show that the water quality is poor enough to violate the Eighth Amendment.

Because the parties did not address plaintiffs' medical care claims, the court will set a scheduling conference to discuss how to resolve those claims.

PRELIMINARY MATTERS

**A. Parties**

All of the defendants except for former Department of Corrections Secretary Ed Wall are represented by the attorney general's office. These defendants, who I'll refer to as the "state

defendants," have filed a motion for summary judgment. Dkt. 105. Wall has filed his own motion for summary judgment. Dkt. 99. Wall's motion raises few substantive arguments, but the factual and legal issues discussed in this opinion apply equally to Wall and the state defendants. So in many parts of the opinion I will not distinguish between the state defendants and Wall.

Plaintiffs had all been represented jointly by recruited counsel, but some of the plaintiffs expressed dissatisfaction with their representation. Plaintiffs Tyrone Davis Smith and Michael Van Caster stated their desire to end counsel's representation, sever their cases from the other plaintiffs', and have new counsel recruited. *See* Dkt. 113. I granted their motion to sever their cases and reopened Van Caster's previously dismissed case, No. 18-cv-1009-jdp. Dkt. 143, at 2–3. But I denied their motion to have new counsel recruited. *Id.* Van Caster responded by filing a motion for "re-joinder," stating that he did not authorize Smith to include him in Smith's severance request. Dkt. 145. I'll grant Van Caster's motion and treat him as a co-plaintiff in this case. I'll dismiss Van Caster's previously reopened solo case.

Plaintiff Norman Stapleton filed documents suggesting that he was also considering terminating counsel's representation, so I gave him a short time to confirm his intentions. *See* Dkt. 143, at 3–4. Stapleton has responded by stating that he wishes to remain represented by recruited counsel. Dkt. 144.

## B. Motions to submit additional evidence

In early December 2019, plaintiffs filed a motion to supplement the record with evidence that they had newly obtained from the state. Dkt. 147. Plaintiffs contend that this evidence shows Department of Corrections officials' continued failure to meet DNR requirements and the officials' "deliberate efforts to conceal the dangerous lead concentration

from the inmates." *Id.* at 3. Plaintiffs followed with an amended version of the motion and attached materials, and they withdrew the original motion. *See* Dkt. 149. The state defendants filed a response and their own proposed supplemental materials, Dkt. 150 and Dkt. 151, which they also amended following plaintiffs' revision, Dkt. 152. I'll grant both sides' motions to add additional evidence, and I will include portions of that evidence in the undisputed-facts section of this opinion.

## C. Scope of summary judgment motions

Plaintiffs bring claims that defendants have consciously disregarded their serious medical conditions caused by exposure to the Fox Lake water and the risk of harm posed by the contaminants because their preexisting conditions make them more vulnerable to those chemicals. But in their opposition brief, plaintiffs say that that "[t]o conserve resources, the parties have agreed to dispense with proving the individual liability of each Defendants at this stage. . . . [and] to forego an analysis as to whether each plaintiff actually experienced harm as a result of drinking the water." Dkt. 124, at 2. In their motion for preliminary injunctive relief, plaintiffs say that the parties agreed to defer discovery and motion practice regarding the health risks posed by the lead in Fox Lake's water. Dkt. 130, at 3 n.3. Despite my appointment of Alfred Franzblau as a medical and toxicology expert under Federal Rule of Evidence 706, neither side produces any evidence regarding medical problems or Fox Lake's treatment of those problems. So defendants' summary judgment motions are more accurately described as motions for partial summary judgment on plaintiffs' conditions-of-confinement claims.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

## A.  Parties

The plaintiffs in this case are Norman Stapleton, Paul Adams, Craig Bates, Duane Bull, Cameron Canady, Scott Coakley, David Foley, Timothy Gibson, Kenneth Gray, James Hamilton, Stephen Kozlowski, Thomas Kuruc, Willie McGee, Allen Owens, Michael Paskel, James Smith, Tyrone Davis Smith, Sean Tate, and Michael Van Caster. Plaintiffs were each incarcerated at Fox Lake for at least some of the time at issue in this case. Paskel was at Fox Lake from 2006 to 2014. All of the other plaintiffs' time at Fox Lake started in 2013 or later.

Some of the defendants are current or former high-ranking officials at the Wisconsin Department of Corrections. Defendant Kevin Carr is the current secretary. Defendants Gary Hamblin, Jon Litscher, and Edward Wall are former secretaries. Defendant Cathy Jess held positions as the secretary and as administrator of the Division of Adult Institutions. The remaining defendants all worked at Fox Lake for at least part of the events of this case.  Randall Hepp and Marc Clements were wardens. Joy Tassler was the corrections management services director. Michael McCormick, Patrick Chamberlin, and John Maggioncalda were buildings and grounds superintendents.

## B.  Non-party testimony

Both sides rely on deposition testimony from Abigail Cantor and William Weisensel. Cantor is an engineering consultant hired by the state to investigate the water quality at Fox Lake. *See* Dkt. 97. Weisensel is the utility plant operator at Fox Lake. *See* Dkt. 96. I appointed David W. Hand as a water-quality expert under Federal Rule of Evidence 706. Hand is a

5

professor of civil and environmental engineering at Michigan Technological University. Both sides discuss his report, Dkt. 95, and supplement, Dkt. 109.

## C. Lead and copper

Fox Lake's water system is considered to be a municipal system under Wisconsin law, so the Wisconsin Department of Natural Resources (DNR) requires regular sampling and testing of drinking water at the prison. Drinking water, including bottled water, may contain at least small amounts of some contaminants. People often obtain part of their needed intake of copper from their drinking water, but exposure of elevated levels of copper can be hazardous to human health.

Lead is also hazardous to human health; according to the National Institute of Environmental Health Sciences, "No blood lead level is safe."[1] Cantor states that "health professionals say zero parts per billion is what the goal should be for lead." Dkt. 97, at 21. The United States Environmental Protection Agency (EPA) states that it "has set the maximum contaminant level goal for lead in drinking water at zero because lead is a toxic metal that can be harmful to human health even at low exposure levels. Lead is persistent, and it can bioaccumulate in the body over time."[2]

But that zero-lead goal is not enforced by law. Drinking water regulations are set by the EPA in CFR 40 Part 141. The "Lead and Copper Rule" is a section of the primary drinking water regulations, enacted in 1991 to address the transfer of lead and copper from piping

---

[1] National Institute of Environmental Health Sciences, *Lead*, https://www.niehs.nih.gov/health/topics/agents/lead/index.cfm.

[2] United States Environmental Protection Agency, "*Basic Information about Lead in Drinking Water*, https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water.

materials into water. This rule establishes "action limits," also known as "maximum contaminant levels," for metals including lead, copper, and arsenic. The action level for lead is 15 parts per billion. The action level for copper is 1,300 parts per billion.[3] To comply with the rule for a particular chemical, 90 percent of the samples collected during a sampling period must test below the respective action level. The test result commonly reported is the "90th percentile" result, not an average of each sample taken. When a 90th percentile reading is above the action level (what the parties term an "exceedance"), a water system must provide information to consumers about the problem and it must investigate and formulate a plan to solve the problem.

Generally, municipalities replace water distribution pipes every 50 years. Fox Lake has not replaced it pipes since 1960. The accumulation of biofilm, growth of microorganisms, and buildup of chemical scale in the Fox Lake system has led to corrosion that can release chemicals into the water.

October 2008 testing at Fox Lake showed the 90th percentile reading at 2,000 parts per billion for copper, over the 1,300 parts-per-billion action level. Plaintiffs and the state defendants both say that at least some areas of Fox Lake tested over the limit for lead, although neither party supports that finding with any evidence. According to DNR records submitted by the parties, confirmed by Cantor and Weisensel, the first exceedance with lead was in 2012. The DNR order relied upon by the parties, Dkt. 108-8, states only that the copper concentration was too high.

---

[3] An alternate way the parties present these figures is in micrograms or milligrams per liter of water. The action level for lead is 15 micrograms per liter or 0.015 milligrams per liter. The action level for copper is 1,300 micrograms per liter or 1.3 milligrams per liter.

The DNR issued a notice of noncompliance in December 2008. Fox Lake staff attempted to remediate the problem by adding phosphate to the water for corrosion control. Cantor says that the chemical was added to the water under the recommendation of the DNR and the EPA. June 2009 testing showed lead and copper concentrations below the action level.

July 2012 testing showed both lead and copper concentrations exceeding the action level; lead was at 17.5 parts per billion; copper was at 1,550 parts per billion. Cantor theorizes that the chemical added to the water following the 2008 tests either did not help to reduce lead and copper levels or actually worked to increase them because the chemical "holds" metals in the water. As part of compliance with the DNR's notice following these tests, Fox Lake staff provided inmates with "public education materials" to inmates. *See* Dkt. 108-8, at 2. Neither side submits those materials.

In January 2013, the DNR conducted a "Drinking Water Sanitary Survey," which discussed the 2012 lead and copper exceedances, calling them "significant deficiencies," and requiring Fox Lake staff to study the water system and report findings to the DNR by June 2013, with implementation of the study recommendations by the end of 2013. The DNR recommended adding another utility plant operator in addition to Weisensel, but the prison did not add another operator. The lack of staffing made it more difficult for Weisensel to carry out cleaning and remediation efforts.

In June 2013, Cantor started investigating the water-quality problems.[4] Because Cantor is not a well expert, she recommended Andrew Jacque, a water-quality scientist, to investigate

---

[4] The parties disagree about when Cantor started doing work for the Department of Corrections, and the state defendants' own materials are internally inconsistent on this point. But Cantor states that she performed her initial investigation in June 2013, Dkt. 97, at 49, which is supported by her June 28, 2013 report on the water system, Dkt. 97-12.

the wells that are connected to the system. The state hired Jacque to do so. Cantor's initial work at Fox Lake included the installation of a monitoring system. The state hired an independent laboratory to take weekly water samples. The parties do not provide the results of those weekly tests.

Cantor issued a report in late June 2013, including recommendations that the state carry out recommendations by Jacque to rehabilitate the wells,[5] install a treatment facility if need be, determine the practicality of "uni-directional" flushing, consider using a biofilm-destroying chemical in the distribution system along with chlorine, eventually reduce the use of phosphates, and monitor the water throughout the process. Weisensel describes "uni-directional flushing" as a technique in which staff "clos[es] water main valves and open[s] fire hydrants in a sequence . . . to give you the maximum velocity through a pipe in order to remove the most of this debris that you can." Dkt. 96, at 51. In November 2013 and January 2014, Fox Lake and DNR staff met for "enforcement conferences" to work out a plan to resolve the problem.

The EPA requires municipal water systems to prepare "consumer confidence reports" to provide information concerning water quality for the previous monitoring year. The 2014 report prepared for Fox Lake reported test results from June 2013, showing a 90th percentile lead concentration of 43 parts per billion and a copper concentration of 810 parts per billion.[6] But the report stated that the samples with elevated levels of lead were at guard towers.

_____

[5] Cantor refers to a report authored by Jacque, *see* Dkt. 97-12, at 19, but the parties do not include it.

[6] The state defendants present a chart summarizing test data represented in the 2014, 2015, and 2016 consumer confidence reports, stating that the results shown are the Fox Lake lead and copper concentrations for those respective years. Dkt. 136, at 25, ¶ 64. Plaintiffs do not dispute that finding. *Id.* But that is not what the reports show. The reports include specific

July 2013 tests showed a 90th percentile lead concentration of 175 parts per billion, well exceeding the action level. On November 7, 2013, the DNR sent a notice of noncompliance to Fox Lake because the lead and copper concentrations were above action levels.

In May 2014, the Department of Corrections entered into a consent order with the DNR regarding the water quality at Fox Lake. Specifically, Fox Lake agreed to provide "public education" regarding the lead and copper action level exceedances, submit plans for cleaning, flushing, monitoring, and rehabilitation of the wells in the system, and obtain compliance with the lead and copper standards. Fox Lake was also required to establish a routine monitoring schedule for lead and copper. Defendant Hepp signed the consent order on behalf of Fox Lake. Defendant Wall signed it on behalf of the Department of Corrections.

Plaintiffs suggest that a document associated with the decree stated that "the DOC recommends that the inmates drink bottled water or use a water filter in order to abate lead exposure." Dkt. 125, at 4–5, ¶ 28. But plaintiffs cite to Dkt. 47-1, which is the incorrect citation, and I do not see this statement elsewhere in the docket. It is undisputed that Fox Lake did not regularly offer bottled water to inmates during the events of this case. Fox Lake provided bottled water to its employees at least some of the time.

From 2013 to 2015, Fox Lake rehabilitated the wells. A monitoring station was put into service in September 2014. In April 2015, Fox Lake started using a biofilm-destroying chemical. Jacque developed a routine uni-directional flushing plan to remove particulates that

_____

test dates showing that the 2014 and 2015 reports present June 2013 data. *See* Dkt. 108-1, at 5; Dkt. 108-2 at 5. The 2016 report presents 2016 data. *See* Dkt. 108-3, at 5.

could build up in a pipe and then be released, and to prevent water from stagnating too long in the pipes. Weisensel followed that plan. Jacque also created a turbidity management plan that Weisensel followed (turbidity is a measure of the amount of particles in water). Both Cantor and Jacque determined that the addition of phosphate to treat corrosion was potentially contributing to the issues with biofilm in the pipes in the water system, in turn contributing to the lead and copper exceedances. Fox Lake petitioned the DNR to stop adding that chemical to the drinking water system and DNR granted permission to do that. Phosphate was slowly decreased over time and eventually eliminated.

On June 25, 2015, a memorandum was posted in each housing unit stating that elevated levels of lead were found in the drinking water in some of the Fox Lake buildings, and that people with a variety of medical conditions would be more susceptible to injury from the contaminated water.

In November 2015, flushing was cut in half because of a staffing shortage. Nonetheless, the June 7, 2016 water test results showed that lead and copper levels were well below action levels: the 90th percentile reading for lead was 0.26 parts per billion and the copper reading was 25 parts per billion. Dkt. 108-9, at 1. Plaintiffs attempt to dispute this finding but they do not explain why they think this inaccurately recounts the test results in the record. On June 30, 2016, defendant Hepp issued a memo to staff, inmates, and visitors discussing the remediation efforts made by Fox Lake and recounting the June 7 test results.

The 2016 consumer confidence report, presenting results from some undisclosed time in 2016, showed a 90th percentile lead concentration of 0.56 parts per billion and a copper concentration of 230 parts per billion. November 2016 test results showed a 90th percentile

lead concentration of 0.43 parts per billion and a copper concentration of 250 parts per billion. All of these results were well below the respective action levels.

In December 2016, the DNR sent a "close out" letter to the Department of Corrections regarding the 2014 consent order regarding lead and copper, noting that the Department of Corrections had successfully rehabilitated or reconstructed three wells, used chemical additives to breakdown biofilms within the water system, and conducted flushing to remove the biofilm in the water mains. The DNR stated that it would not take further action because the sampling showed that Fox Lake was in compliance for lead and copper concentrations. Later that month, Hepp issued another memo sharing the November 2016 test results and stating that the DNR had closed out the consent order.

In either January 2016 or January 2017 there was a release of lead into the Fox Lake water supply, perhaps caused by maintenance on the prison's fire protection system, which is connected to the municipal water system.[7] Plaintiffs say that this put Fox Lake out of compliance with the lead action level, but neither they nor defendants provide a test result indicating the lead level after that event. If discolored water is discovered at Fox Lake, the facilities manager and water systems operator flush the system to get the disturbed accumulation out. Cantor says that there "shouldn't be a problem in drinking the water" after the system is flushed. Dkt. 97, at 70.

April 2017 water test results showed a 90th percentile lead concentration of 0.51 parts per billion and a copper concentration of 120 parts per billion.

---

[7] The parties agree that there was one "release event" but the evidence is contradictory about exactly when that event occurred.

In October 2018, the DNR changed Fox Lake's monitoring requirements for lead and copper because Fox Lake's previous lead and copper sampling results had been below action levels. Instead of sampling twice per year, the DNR changed Fox Lake's monitoring requirements to sample once per year.

The September 2019 test results showed a 90th percentile lead concentration of 0.17 parts per billion and a copper concentration of 29 parts per billion.[8]

## D. Iron and manganese

The June 2016 testing revealed another problem. Elevated levels of manganese and iron were detected at Fox Lake. These concentrations did not violate the health standards for these elements, but they did violate "secondary" standards for matter that could affect the look, taste, and smell of the water.[9]

Discolored water often results from iron and manganese in the water; iron gives water a red, orange, or brown hue, and manganese can give water a brown or black hue. Discolored water is a common issue in water systems, and all systems have "events" that may lead to discolored water. Weisensel says that the discoloration is only "occasional," and lasts less than an hour at a time after staff flushes the pipes. Dkt. 96, at 31, 52–53. Weisensel admits that he wouldn't drink the water during a "discoloration event," but he drinks it otherwise.

---

[8] Plaintiffs initially provided these test results in an effort to show that the lead results exceeded the 15 parts per billion action level, but the parties now agree that because of an "electronic document error," the results included a decimal point not readily visible, bringing the lead results well below the action level. Plaintiffs filed a motion to expedite a hearing on their motion for preliminary injunctive relief based on this error. Dkt. 148. That motion is denied.

[9] *See* United States Environmental Protection Agency, "Secondary Drinking Water Standards: Guidance for Nuisance Chemicals," https://www.epa.gov/dwstandardsregulations/secondary-drinking-water-standards-guidance-nuisance-chemicals.

On October 10, 2016, the DNR send defendant Warden Hepp a letter stating that it issued the Department of Corrections a notice of non-compliance for exceeding the standards for iron and manganese. The DNR explained that the elevated levels—though not a health risk—may be "objectionable to an appreciable number of persons." Dkt. 108-5, at 1. The DNR required Fox Lake staff to post a notice stating in part:

> At the Fox Lake Correctional Institution (FLCI), manganese and iron were found in amounts that may cause changes in the taste, color, or smell of your drinking water. But, you will not get sick from drinking the water. The levels of manganese and iron were above their secondary standards. These standards are used to help judge the taste, color, and smell of drinking water. But the water is still safe to drink. . . .

*Id.* at 4.

The DNR and the Department of Corrections entered into another consent order in July 2018, this time about iron and manganese concentrations of each of the wells being over the secondary, aesthetic standard. Dkt. 96-2, at 10. This consent order was signed by defendant Jess, then the secretary.

The parties do not discuss the specifics of the consent order, but I'll include a brief summary here. The order stated that Fox Lake staff's cleaning efforts following the 2016 notice of noncompliance were only partially effective. Fox Lake staff flushed and "air scoured" the system in 2017, resulting in the iron and manganese concentrations receding below the secondary standards, but then rising back above the limit "after a few months." *Id.* at 11. The DNR determined that Fox Lake needed to install a water treatment system to keep iron and manganese below the secondary standards, with a deadline of April 2021 to complete that installation. *Id.* at 11, 13. The consent order included additional deadlines for Fox Lake to prepare a standard operating procedure for turbidity management, conduct air scouring, and

complete pilot testing of iron- and manganese-treatment methods. The DNR gave Fox Lake until April 2022 to return to compliance with the iron and manganese secondary standards.

On November 11, 2018, Jacque sent an email to the DNR saying that efforts to reduce iron and manganese, such as "shock chlorination," were proving unsuccessful, and that Fox Lake staff would assess other methods of reducing those chemicals, but that the work would not be complete by the December 1, 2018 deadline for completion of pilot work set in the new consent order. Weisensel says that Fox Lake is currently working on a DNR-approved project to install a water filtration system to reduce iron and manganese.

On January 10, 2019, the DNR conducted a sanitary survey of Fox Lake's water system. A report of the survey was issued on February 14, 2019. The survey report did not identify any "significant deficiencies," noted that that Fox Lake had "a very good record of compliance with monitoring and reporting requirements," and that the only concern with the water quality were the secondary concentrations of iron and manganese.

The survey report included notice of noncompliance for three non-significant deficiencies: Fox Lake had to (1) update its monitoring plan by eliminating some of the water-sample sites from its sampling pool to reflect decreased frequency in testing; (2) update emergency plans; and (3) repair reservoir roof cracks. Weisensel says that all of these deficiencies had either already been corrected at the time of the report or within several weeks of the report.

The survey report also included a recommendation that Fox Lake hire a second certified water operator, stating that Weisensel, as the only Fox Lake operator, "may struggle to keep up with the [water management] tasks" specified under the new consent order.

## E.  Opinions

Cantor says that Fox lake has followed her recommendations: "It's taken time to get everything into place, but, yes, we're monitoring, cleaning water systems, cleaning building plumbing, changing dosages of chemicals. Yes. So far they've been very good clients in carrying out these recommendations." Dkt. 97, at 106–07.

Although Cantor recommended in her 2013 report that Fox Lake may need to install a treatment facility to remove harmful substances, Fox Lake has not yet done so. In his deposition, Weisensel says, "That has to be approved by DNR and the [Division of Facilities Development], so we can't just install a filtration system on our own without their approval," and that Fox Lake and Jacque are working on a plan to remove iron and manganese. Dkt. 96, at 72.

Cantor's 2017 status report stated that "on average, the turbidity stays in an acceptable range at sites around campus. But the data also show that there are discrete events that result in unacceptable drinking water," so they continue to work on methods to reduce turbidity, such as flushing. Dkt. 108-11, at 25.

I appointed David W. Hand, a professor of civil and environmental engineering at Michigan Technological University, as a water-quality expert under Federal Rule of Evidence 706. Hand's report included the following statements:

- "I agree with the remediation efforts carried out at FLCI."

- "The remediation needed to be conducted in a stepwise approach as was done for both the wells and the water system. The remediation efforts were implemented within a reasonable time considering the system was not able to be shut down for remediation."

- "The remediation was well planned and implemented to address the potential health problems at the facility."

- "Dr. Cantor's plan was a well thought out plan and implemented in such a way as to minimize system disturbances at FLCI."

- "[I]f iron and manganese are still becoming a problem for FLCI water quality, I would implement treatment as was mentioned by Dr. Cantor in her report."

- "I believe Dr. Cantor's plan was followed."

- "If a good asset management plan was carried out there would not have been water quality incidents at FLCI."

Dkt. 95, at 4, 19, 20.

Hand followed with a supplement to his report. Dkt. 109. In response to the question when Fox Lake should have started remediation efforts, Hand discussed the history of Fox Lake lead and copper results and Fox Lake's remediation efforts, and concluded, "In my opinion, FLCI followed the lead and copper rule protocol. . . . In this case, remediation took place after the problems associated with the water quality were determined and carried out in a timely and responsible manner." *Id.* at 2–3.

Hand also addressed the asset-management issue further. He stated:

> It is not required by law to have an asset management program. But it is a best practice to have such a program so that the system is maintained and functioning properly. . . . With the information given to me it did not appear that the FLCI facility followed best practices in maintaining their wells and distribution system. In their case, best practices could have prevented problems encountered with poor water quality from the wells and corrosion in the distribution system. In hindsight it would have been reasonable to have an asset management program.

*Id.* at 3–4.

## F. Plaintiffs' complaints

Plaintiffs close their proposed findings with a section titled "Through the Plaintiffs' Eyes," compiling allegations from the nine plaintiffs who filed individual complaints before consolidation. *See* Dkt. 125, at 10. But not all of these proposed findings are admissible at the

summary judgment stage; only some of the plaintiffs have submitted *verified* complaints in which they stated under penalty of perjury that their allegations are true. *See, e.g.*, *Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017) (verified complaint is the equivalent of affidavit).

Plaintiff Stapleton alleges that the water at the prison "smells and tastes disgusting" and "sometimes has a brownish color." Even when he allows the water to run "for a couple minutes," the water looks, smells, and tastes the same. Defendants would not give him bottled water even though they were aware of his high blood pressure.

Plaintiff Tate began experiencing headaches, stomach pain, diarrhea, and nausea after being transferred to Fox Lake. Tate learned from other inmates that the drinking water was contaminated with high levels of lead and copper. Fox Lake would not provide him with free bottled water.

Plaintiff Smith was forced to drink the Fox Lake water containing lead and copper. Since arriving at Fox Lake, he suffers from health issues, including high blood pressure and cardiac dysfunction. Fox Lake will not give him free bottled water.

Plaintiff Owens was forced to drink the Fox Lake water despite receiving a June 2015 memo stating that dangerous chemicals were in the water. Prison officials denied his request for free bottled water.

ANALYSIS

A.  Water quality claims

Plaintiffs contend that defendants violated their Eighth Amendment right to be free from cruel and unusual conditions of confinement by subjecting them to unsafe and aesthetically unpleasing drinking water. More specifically, they contend that the water

contained unsafe levels of lead and copper, and that the water was so spoiled by contaminants like iron and manganese that it was essentially undrinkable.

The Eighth Amendment requires the government to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). Conditions of confinement that expose a prisoner to a substantial risk of serious harm are unconstitutional. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). To demonstrate that prison conditions violated the Eighth Amendment, plaintiffs must allege facts that satisfy a test involving both an objective and subjective component. *Farmer*, 511 U.S. at 834.

The objective analysis focuses on whether prison conditions were sufficiently serious so that "a prison official's act or omission results in the denial of the minimal civilized measure of life's necessities," *id*., or "exceeded contemporary bounds of decency of a mature, civilized society." *Lunsford v. Bennett*, 17 F.3d 1574, 1579 (7th Cir. 1994).

The subjective component requires an allegation that prison officials acted wantonly and with conscious disregard of a known risk of serious harm to plaintiffs. *Id*. "Conscious disregard" means that defendants knew that plaintiffs faced a substantial risk of serious harm and yet disregarded that risk by failing to take reasonable measures to address it. *Farmer*, 511 U.S. at 847. Thus, it is not enough for plaintiffs to prove that defendants acted negligently or should have known of the risk. *Pierson v. Hartley*, 391 F.3d 898 (7th Cir. 2004). Plaintiffs must show that defendants received information from which an inference could be drawn that a substantial risk existed and that defendants actually drew the inference. *Id*. at 902.

### 1. Lead and copper

The water test results show that there have been occasions where the lead and copper concentrations have exceeded the EPA's action level. And I infer from the test results that the water has always contained and continues to contain some amount of lead and copper. For ease of reference I've prepared a chart of the lead and copper test results in the parties' proposed findings, with the results exceeding EPA action levels shaded:

| | Lead (action level over 15 ppb) | Copper (action level over 1,300 ppb) |
|---|---|---|
| October 2008 | Not provided | 2,000 |
| June 2009 | Figure not provided, but below the action level | Figure not provided, but below the action level |
| July 2012 | 17.5 | 1,550 |
| June 2013 | 43.0 | 810 |
| July 2013 | 175.0 | Not provided |
| June 2016 | 0.26 | 25 |
| 2016 consumer confidence report | 0.56 | 230 |
| November 2016 | 0.43 | 250 |
| April 2017 | 0.51 | 120 |
| September 2019 | 0.17 | 29 |

Some amount of copper in the water isn't necessarily a bad thing; people often obtain part of their needed intake of copper from their drinking water. In their opposition brief, plaintiffs do not focus on copper; they instead focus on lead. There is no health benefit to lead in drinking water; even the smallest amount of lead can be harmful to human health. Plaintiffs therefore argue that the water has always been unsafe because it contained at least some lead, even if below the EPA's action level. They ask for preliminary injunctive relief, stating that "[p]laintiffs are being poisoned against their will" and that "[a]s it is undisputed that there are

no safe levels of lead, it would naturally follow that forcing Plaintiffs inmates to drink discolored, lead-infested water is currently unsafe." Dkt. 130, at 2. They ask for an order requiring defendants to provide them with filtered or bottled water.

The problem for plaintiffs is that Eighth Amendment caselaw makes clear that inmates are not entitled to completely pristine conditions of confinement, including drinking water. "Poisoning the prison water supply or deliberately inducing cancer in a prisoner would be forms of cruel and unusual punishment . . . . But failing to provide a maximally safe environment, one completely free from pollution or safety hazards, is not." *Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (plaintiff must show that he was subjected to "unreasonably high levels" of second-hand smoke); *McNeil v. Lane*, 16 F.3d 123, 125 (7th Cir. 1993) ("Exposure to moderate levels of asbestos is a common fact of contemporary life and cannot, under contemporary standards, be considered cruel and unusual.").

In *Carroll*, the Court of Appeals for the Seventh Circuit affirmed dismissal of an inmate's case regarding concentrations of radium in the water over the EPA's limit. The court concluded that prison officials did not violate the Eighth Amendment by subjecting inmates to elevated levels of radium because state environment officials told prison staff that no remedial measures needed to be taken: the EPA was considering raising its radium limit above the levels reported at the prison. *Id.* The court stated:

> Many Americans live under conditions of exposure to various contaminants. The Eighth Amendment does not require prisons to provide prisoners with more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans. It would be inconsistent with this principle to impose upon prisons in the name of the Constitution a duty to take remedial measures against pollution or other contamination that the agencies responsible for the control of these hazards do not

21

> think require remedial measures. . . . They can defer to the
> superior expertise of those authorities.

*Id.* at 472–73. The United States District Court for the Eastern District of Wisconsin applied

*Carroll's* principles to a recent Fox Lake water case, dismissing a plaintiff's claims about water

quality in 2016 and 2017 because no EPA health standards were violated during that time.

*Adell v. Hepp,* No. 17-cv-267-JPS, 2017 WL 6210820, at *6 (E.D. Wis. Dec. 7, 2017).

A similar analysis applies here, at least with regard to the present-day lead and copper

levels at Fox Lake. The last test result showing a lead exceedance was in June 2013, and the

last copper exceedance was in July 2012. Tests over the last several years have all showed lead

and copper levels within the EPA action levels.[10] That means that plaintiffs cannot succeed on

claims about the current concentrations of lead or copper, or be granted a preliminary

injunction regarding the current concentration of lead. *See id.* ("Because the water 'survived

regulatory scrutiny, it cannot plausibly serve as the basis for a constitutional claim.'" (quoting

*Moore v. Monahan*, 428 Fed. Appx. 626, 630 (7th Cir. 2011) (plaintiff failed to state Eighth

Amendment claim because he attached to his complaint a state EPA report showing that

facility's water was "safe and not susceptible to contamination."))). I will deny plaintiffs'

motion for preliminary injunctive relief.

That still leaves a question about claims for past harm concerning the times when the

water did exceed the action levels: the lead concentration in 2012 and 2013, and the copper

concentration in 2008 and 2012. The test results are snapshots of the concentrations of

---

[10] There was also a lead "release" event in January 2016 or January 2017 in conjunction with maintenance on the fire protection system, which is connected to the drinking water system. But other than noting this event, plaintiffs do not explain the amount of lead released into the water, the length of the effects of that event, or the likelihood of reoccurrence.

chemicals in the water, and those concentrations fluctuate. We don't know how long the lead and copper concentrations stayed above the action levels after those tests; Cantor says that Fox Lake was not required to take samples during the remediation period, from 2013 to 2016. Dkt. 97, at 73. Plaintiffs do not present any evidence, such as Fox Lake's internal testing, showing how long the July 2013 lead exceedance lingered in the system. I can't infer that the exceedance lasted the entire three-year remediation period because that inference would be based on mere speculation. *See, e.g.*, *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (While nonmovant "is entitled . . . to all reasonable inferences in her favor, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." (citation omitted)). Nor do plaintiffs provide medical evidence about the harm the recorded lead and copper concentrations could cause over the periods of time at issue here.

What ultimately dooms plaintiffs' claims is that even if those lead and copper concentrations did pose a serious risk of harm to Fox Lake inmates, the undisputed facts show that defendants took reasonable measures to remediate the problem. Thus, plaintiffs cannot make the required showing of conscious disregard. For instance, in 2008 after the first copper exceedance, staff added phosphate for corrosion control. The first test results after the copper exceedance came back under the action level, so the problem appeared to have been solved.

After the lead and copper exceedances in 2012 and 2013, Fox Lake brought in Cantor and Jacque to study the problem, met with the DNR to discuss remediation, and took multiple steps to remediate the problem, including rehabilitating the wells, installing a monitoring station, using a biofilm-destroying chemical, regularly flushing the system, and reducing the use of phosphates. These efforts eventually proved effective: the DNR "closed out" the consent

order in December 2016, and the 2016 through 2019 lead and copper test results fell below the action levels. And both Cantor and court-appointed expert Hand vouch for the reasonableness of the efforts: Cantor said "they've been very good clients in carrying out these recommendations," and Hand says that he "agree[s] with the remediation efforts," that "[t]he remediation efforts were implemented within a reasonable time," and that he "believe[s] Dr. Cantor's plan was followed." Usually, a defendant's good-faith attempt to solve a problem that poses a serious risk of harm shows that the defendant didn't consciously disregard the problem.

Plaintiffs raise several arguments in an attempt to show defendants' conscious disregard despite the apparent success in remediating lead and copper. They say that defendants didn't do enough to solve the problem; the only way to truly address the problem would be to replace the pipes, install water filters, or provide bottled water. They also say that defendants did not follow all of Cantor's suggestions or Hand's best practices, such as installing a water treatment facility, using a water management asset plan, installing an automatic flushing system, or adding additional staff to conduct flushes more frequently. But the Eighth Amendment does not require perfect solutions to problems, and in any event, the experts here—Cantor and Hand—state that defendants' remediation efforts were adequate and accomplished with reasonable speed. Underlying plaintiffs' argument is the idea that defendants failed to purge 100 percent of the lead from the system, which plaintiffs say leaves the water unsafe. But I've already concluded that they can't win on an Eighth Amendment claim for concentrations of harmful chemicals below the government-defined threshold.

Plaintiffs also argue that defendants' conscious disregard can be inferred from the way they handled inmate notifications about the problem. They say that Fox Lake didn't notify inmates about the lead and copper exceedances until it issued two notices in 2016, and that

those notices contained misleading information concealing the true danger to inmates. They argue that it was false for the notices to say that the water was safe, that the lead concentrations were below the action levels, that the test results showed full compliance with DNR standards, and that any samples testing over the action level were from non-inmate areas.

But the record shows that Fox Lake also provided "public education" materials to inmate after the July 2012 exceedance. Neither side produces those materials, but it's plaintiffs' duty to support their assertions with evidence, and they fail to do so. They also fail to show that the 2016 notices were misleading, given the time at which they were issued, after the lead and copper concentrations had fallen well below the action levels. No reasonable jury could conclude that Fox Lake staff meant to mislead prisoners by calling the water "safe" although it contained trace amounts of lead below the action level. Plaintiffs say that the notices misled about the entire prison's water being safe because the test results showed individual sampling sites with lead concentrations above the action level. This is a misreading of the results: each of the 40 sampling sites on those reports have results under 15 parts per billion. *See* Dkt. 108-4, at 2; Dkt. 108-7, at 2.

And the statement about the location of the sites with lead concentrations exceeding the action levels isn't clearly false either. The 2013 consumer confidence report stated that the sample sites exceeding the action level in June 2103 were from three guard towers. Cantor adds, "they went out of compliance with lead in 2012. That was actually ironic because it was a matter of where they chose to sample for the compliance monitoring. They sampled water that was not representative of water that people were consuming, and that sent them out of compliance for lead." Dkt. 97, at 19. Weisensel also stated that the poor results were from guard towers, where inmates would not be present. Dkt. 96, at 37–38. The record is not

detailed enough to tell for sure whether every sample exceeding the action level for every year's testing cycle was from non-inmate areas, but there is not sufficient evidence for a reasonable jury to say that defendants acted with conscious disregard by lying about the source of the offending water.

Because plaintiffs fail to show that defendants acted with conscious disregard of the lead and copper exceedances at Fox Lake, I will grant both sets of defendants' motions for summary judgment on the Eighth Amendment claims about lead and copper.

### 2. Aesthetic concerns

Plaintiffs also contend that, aside from the precise concentrations of contaminants, the water at Fox Lake was undrinkable because it was discolored and it tasted and smelled bad. The parties appear to agree that the main culprits for this problem are the iron and manganese concentrations. The earliest objective evidence the parties cite for these concentrations is the June 2016 test results, showing both iron and manganese over the EPA's "secondary" standards for aesthetic—not health—concerns.

The state defendants cite *Carroll* and *Adell* in contending that plaintiffs cannot succeed on an Eighth Amendment claim about the iron and manganese concentrations because there is no evidence that those concentrations ever exceeded EPA health standards. But as plaintiffs argue, the state defendants' position misses the point. Prisoners have an Eighth Amendment right to adequate sustenance, including water or other fluids. *See, e.g.*, *Hardeman v. Curran*, 933 F.3d 816, 820 (7th Cir. 2019) ("All but the most plainly incompetent jail officials would be aware that it is constitutionally unacceptable to fail to provide inmates with enough water for consumption and sanitation over a three-day period.").

The presence of harmful chemicals is one way that a prison's drinking water could be so unacceptable as to violate this right. But it's not the only way. Plaintiffs rely on *Hardy v. Godinez*, No. 12 C 6033, 2017 WL 2569605 (N.D. Ill. June 12, 2017), for the proposition that a prisoner could conceivably prove a deprivation of his Eighth Amendment right to adequate fluids by showing that the drinking water was so discolored and foul smelling or tasting that it rendered the water undrinkable. *See Hardy*, 2017 WL 2569605, at *9 (denying summary judgment to defendants on claim that prison's drinking water "was brown, had a foul smell of either sewerage or bleach, and made [plaintiff] ill").

I agree with plaintiffs that this type of theory could support an Eighth Amendment claim. But to prevail with such a claim, plaintiffs have to show that the water was truly so objectionable that it deprived them of a "minimal civilized measure of life's necessities." As the Court of Appeals for the Seventh Circuit has often said, the summary judgment stage is the "put up or shut up moment in a lawsuit." *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (internal quotation omitted). This means that the non-moving party—in this case, plaintiffs—must respond "by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Id.*

Plaintiffs' proposed findings are pitched almost exclusively toward the lead and copper claims; their evidence regarding the objective aesthetic quality of the water is woefully thin. Plaintiffs cite to Cantor's and Weisensel's depositions for its proposed finding that Fox Lake "encounters water discoloration." Dkt. 125, at 6, ¶ 35 (citing Dkt. 96, at 30–31, Dkt. 97, at 29–30). But Weisensel says that the discoloration is only "occasional," and lasts less than an hour at a time after staff flushes the pipes. Dkt. 96, at 31, 52–53. Cantor didn't personally see

discolored water, but she knew that there had been discrete incidents in which discolored water had ben caused by disturbances in the system. Dkt. 97, at 40–41.

Otherwise, all plaintiffs provide in their proposed findings about the aesthetic-quality claims are the iron and manganese test results, the fact of the 2018 DNR consent order, and plaintiff Stapleton's subjective allegation that the water smells and tastes "disgusting." But breach of a state or federal regulation is not itself a constitutional violation. It's undisputed that there have been problems at Fox Lake with discolored water and particulates, but the evidence provided here doesn't rise to that in *Hardy*, where the water smelled like sewage or bleach and the prisoner became physically ill after drinking it. Without more detail to the exact conditions that inmates experienced, plaintiffs have provided nowhere near enough evidence for a reasonable jury to conclude that the water was so egregiously objectionable that it deprived inmates of sustenance. *See Yellen v. Olivarez*, 668 F. App'x 762, 763 (9th Cir. 2016) (prisoner's claim regarding cloudy, iron- and manganese-rich water fails "because the Eighth Amendment requires only that food and water be adequate to maintain health, not that it be tasty or aesthetically pleasing." (internal quotations omitted)). So although the evidence seems clear that prisoners have been subjected to substandard water at Fox Lake, they fail to show that the conditions are bad enough to violate their Eighth Amendment rights. So I will grant both sets of defendants' motions for summary judgment on this claim.

### 3. Qualified immunity

Because I am granting summary judgment to defendants on the merits of plaintiffs' claims discussed above, I need not address both sets of defendants' qualified immunity arguments.

**B. Remaining proceedings**

This leaves plaintiffs' Eighth Amendment medical care claims about the health risks posed by Fox Lake's water to particular inmates, and the treatment of medical conditions that were caused by the water. For instance, Fox Lake's December 2016 notice said, "adults with kidney problems and high blood pressure can be affected by lower levels of lead more than healthy adults." Dkt. 108-7, at 3. At least some of the plaintiffs here say that they have high blood pressure yet were subjected to unsafe amounts of lead. Some of the plaintiffs say that they developed medical conditions because of the water. Although I appointed a neutral expert on medical and toxicology issues, the parties have so far presented no evidence related to the medical care claims.

Plaintiffs say that the parties agreed to defer discovery on these issues. I will direct the clerk of court to set a telephone conference with Magistrate Judge Stephen Crocker to set a new schedule for resolving these claims. As part of the schedule, plaintiffs should identify which of them join in medical care claims. Those plaintiffs that do not join in those claims will be dismissed from the case.

# ORDER

IT IS ORDERED that:

1. Plaintiff Michael Van Caster's motion for re-joinder, Dkt. 145, is GRANTED.

2. Van Caster's individual case, No. 18-cv-1009-jdp, is DISMISSED.

3. Plaintiffs' motion to supplement the record, Dkt. 149, is GRANTED.

4. The state defendants' motion to supplement the record, Dkt. 152, is GRANTED.

5. Plaintiffs' motion to expedite a preliminary injunction hearing, Dkt. 148, is DENIED.

6. Plaintiffs' motion for a preliminary injunction, Dkt. 130, is DENIED.

7. The state defendants' motion for partial summary judgment, Dkt. 105, is GRANTED.

8. Defendant Wall's motion for partial summary judgment, Dkt. 99, is GRANTED.

9. The clerk of court is directed to set a telephone conference with Magistrate Judge Stephen Crocker to set a new schedule for the remainder of the case.

Entered February 6, 2020.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge